**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

PROSPERA AFRICA LLC,

  *Plaintiff,*

    v.

MAGATTE WADE,

  *Defendant.*

Civil Action No. 1:26-cv-00060-RP-ML

### DEFENDANT'S RULE 12(B)(1) MOTION TO DISMISS PALLC'S PETITION

The Petition filed in this case stems from an arbitration proceeding commenced by the plaintiff, Prospera Africa LLC ("PALLC") on November 3, 2025. Because no final arbitration award has been issued, PALLC's request for confirmation should be dismissed.

Defendant Magatte Wade is the former Chief Operating Officer of PALLC, a company whose mission was to create special economic zones in Africa. Throughout the second half of 2025, Ms. Wade voiced concerns about the company's operations to leadership; those concerns were brushed aside. After losing faith in the leadership of the company, Ms. Wade saw no option but to resign from PALLC, so she offered PALLC's leadership a clean break. PALLC, however, believed that Ms. Wade should be forced to work with PALLC indefinitely under a one-sided operating agreement she signed without the benefit of counsel alongside spoken reassurances of fairness. When Ms. Wade refused to remain chained to the company indefinitely, PALLC began a targeted attack against her, denigrating her to her business partners and accusing her of crimes and misconduct. Unsatisfied with Ms. Wade's refusal to return to PALLC, they commenced arbitration proceedings against her before the American Arbitration Association ("AAA").

PALLC's tactics in arbitration make it clear: they are deploying scorched earth litigation tactics against Ms. Wade. Since initiating arbitration in November, PALLC has amended its demand—through erratum or full-on amendment—five times. In less than three months, PALLC has filed more than ten motions, demands, petitions, and other miscellaneous requests for relief

1

with AAA. It has filed two motions seeking relief under AAA Commercial Arbitration Rule 39 ("R-39"), requiring the appointment of an emergency arbitrator. These papers—typically spanning dozens of pages, frequently full of errors caused by PALLC's heavy reliance on generative artificial intelligence, including case and record citations to hallucinated cases—would overwhelm any litigant.

The effect of PALLC's attack is twofold. First, PALLC's "flood the zone" approach has stymied the arbitration from making any real progress. Bogged down in repeated briefing and R-39 procedures, AAA has yet to start the process of appointing a merits arbitrator and commencing proceedings in earnest. AAA has been unable to schedule a R-22 Preliminary Hearing, let alone set the schedule and parameters for discovery. Second, PALLC's proliferation of pleadings has driven up the costs associated with the arbitration—costs that Ms. Wade, an individual, must bear. PALLC is represented in the arbitration (and this lawsuit) by individuals associated with the company and its affiliates; Ms. Wade, a non-lawyer, had no choice but to retain outside counsel. With every baseless filing, the expense and disruption to Ms. Wade increases exponentially.

It is against this backdrop that this Petition was filed. PALLC's first R-39 motion requested sweeping preliminary relief, with seven categories of demands. At the same time that its emergency motion was pending, PALLC revised its complaint multiple times. Ms. Wade responded to the R-39 motion by pointing out its legal insufficiencies, requesting to postpone a full factual response until the legal issues were first resolved. That request was neither granted nor denied, and ultimately, all but one of PALLC's requests for relief were denied; Ms. Wade was not offered the opportunity to present any evidence in support of her opposition.

To be clear: PALLC is not seeking to confirm the R-39 arbitrator's interim order because it contends that Ms. Wade has violated it. The Petition contains no such assertion. It is doing so for three reasons. ***First***, PALLC wants to short-circuit the arbitration proceedings by conclusively establishing certain issues as resolved, even though those issues were decided on a preliminary basis without any factual offering from Ms. Wade. PALLC is clear that its intention is for its Petition to create "preclusive effect," even though the R-39 arbitrator signaled the preliminary,

non-final nature of his order. ***Second***, PALLC wants to eschew the confidentiality offered by AAA in furtherance of its campaign of denigrating Ms. Wade publicly.[1] PALLC strategically culled every preliminary statement that portrays Ms. Wade negatively from the R-39 order and presented it, without context, in its publicly filed Petition. There is no doubt that PALLC will use its one-sided Petition to convince Ms. Wade's business contacts that she cannot be trusted and that an arbitrator confirmed as much in his order. ***Third***, PALLC wants to force Ms. Wade to expend money, time, and energy responding to its unrelenting legal attacks. This Petition has the added benefit of taking Ms. Wade's attention away from the AAA proceedings, which have been again derailed by PALLC's filing of yet another demand for R-39 proceedings.

None of these reasons justify the confirmation of a preliminary order that lacks the finality required by the FAA. The appropriate time for confirmation will take place once this case has been fully adjudicated before AAA. For that reason, Ms. Wade respectfully requests that PALLC's Petition be dismissed with prejudice.

## FACTUAL BACKGROUND

Plaintiff Magatte Wade is a Senegalese businesswoman who has dedicated her life to unlocking prosperity in Africa. She focuses on the role of free markets in creating prosperity, dignity, and well-being for Africans. For many years, she has worked to achieve this goal by sharing the blueprint of Africa's economic revolution, speaking about the myths and realities of business in Africa, and working with governments around the world to advocate for more favorable business climates. Over the past fifteen years, Ms. Wade has championed the creation of "special economic zones," or strategically designated areas within a country that aim to enhance economic growth through the passage of unique regulatory measures and legislation, with countless members of her network. Through these efforts, Ms. Wade has developed a strong reputation as a person

---

[1] Indeed, Ms. Wade encourages the Court to compare the redacted materials filed by PALLC against their sealed versions. The redactions applied do not relate to any purported "NDA"—PALLC redacted only statements or allegations that portray it negatively.

with expertise on economic development in the continent of Africa.

In 2022, Ms. Wade was introduced to Erick Brimen, CEO of NeWay Capital LLC, and his team via their shared interest in special economic zones. Mr. Brimen had previously pursued a zone development project in Roatán, Honduras. Mr. Brimen was interested in pursuing a special economic zone in Benin, but did not have any meaningful contacts in Benin or anywhere else in Africa, nor did he have experience obtaining legislation for special economic zones. During that introductory meeting, Mr. Brimen expressed interest in working with Ms. Wade, who possessed the contacts, reputation, and experiences he lacked. Later that year, Ms. Wade and Mr. Brimen formed an entity called Africa Unchained, which went on to execute a Memorandum of Understanding with the Beninese government to develop such a zone—their first.

In November 2023, Ms. Wade and NeWay Capital decided to co-found a new entity, Prospera Africa LLC ("PALLC"). The following spring, Mr. Brimen formally chartered PALLC by registering it in Wyoming. Around the same time, he presented Ms. Wade with PALLC's Operating Agreement, offering her 10% equity in the company, the title of Chief Operating Officer, and a position on the Board of the company. The Operating Agreement also required Ms. Wade to sign an "Assignment of Intellectual Property" (the "Original IP Assignment"), which purported to turn over the intangible value of her life's work to PALLC:

> all intangible personal property, intellectual property, and general intangibles, together with all associated goodwill, relating to Assignor's valuable contact information, good will, and relationships with potential and actual investors and customers in special economic zones to be organized and/or developed in the Continent of Africa, contact information, good will, and relationships with advocates of special economic zones to be organized and/or developed in the Continent of Africa, information contained in research and development into the field of special economic zones to be organized and/or developed in the Continent of Africa, all publications, electronic data, software, designs, and works in progress in the field of developing governance structures and operating governing bodies and businesses within special economic zones to be organized and/or developed in the Continent of Africa, all other intangible personal property, intellectual property, patents, copyrights, trade names and trademarks, work in progress, economic expectancies, economic relations, licenses, permits

4

> instruments, license applications, land acquisition plans, development plans, business plans, customer lists, investor contacts, acquisition target lists, permit applications, contract rights, physical and electronic correspondence, together with all associated good will, in any way related to special economic zones to be organized and/or developed in the Continent of Africa.

*See* **Ex. A** at 46.[2] In exchange for her life's work, which was valued as a "deemed equity contribution of $1,000,000.00 USD," Ms. Wade received one million Founder Preferred Units in PALLC. *See id*. Notably, Ms. Wade was not represented by counsel when she signed these Agreements, nor did she understand the breadth of what the Original IP Agreement purported to transfer. Rather, she understood that she was being asked to use her skills, experience, contacts, reputation, and know-how to support PALLC's efforts—not turn over any "intangible" property.

After formally joining PALLC. Ms. Wade began to leverage her extensive network across the African continent and eventually found that Uganda—rather than Benin or Zanzibar, both of which were explored in detail—showed the most promise for the company's first special economic zone. She assembled a Ugandan team, making unprecedented progress towards enacting the Ugandan legislation required to establish a special economic zone.

In the spring of 2025, as the project in Uganda began to crystallize, Ms. Wade initiated conversations about changing the Company's structure with Mr. Brimen. Mr. Brimen had initially pitched PALLC to investors as an "exploratory fund," but as its function changed, Ms. Wade believed that the entity needed to be restructured, and its Operating Agreement changed, in order to maximize the Company's ability to attract capital from investors, including Ms. Wade's extensive contacts. To that end, between May and August 2025, Ms. Wade and Mr. Brimen negotiated a CEO Employment Agreement and an Amended Operating Agreement that would reflect the changes proposed by Ms. Wade. During those negotiations, Ms. Wade pushed for both fair compensation, given her extensive contacts in the U.S. government and influential contacts

---

[2] Attached as **Appendix 1** is a table of the exhibits referenced in this motion. Out of an abundance of caution, these exhibits have been filed under seal, as PALLC has previously taken the position that they are confidential.

and credibility in Africa, and the adoption of a new investment structure that would help the Company attract investors. However, negotiations broke down after Mr. Brimen began to send increasingly erratic emails and avoid requests for timely responses to Ms. Wade's proposals. After several months of frustrating negotiations, Ms. Wade realized that she was being used as a mere networking source whose vision and accomplishments on the ground were not respected—and that she did not have a future with PALLC.

On September 10, 2025, Ms. Wade informed Mr. Brimen and NeWay that she was "resigning from all of [her] roles with [PALLC] effective immediately [and] relinquish[ing] any equity in all entities in which [she has] held equity or options." *See* **Ex. B** at 5. In connection with her resignation, she executed a stock transfer and related IP Assignment (the "2025 Assignment") that returned her units to the Company in exchange for the return of her purported "IP" that had originally been provided as collateral for those units through the Original IP Assignment. Ms. Wade expected the Company would accept the proposed 2025 IP Assignment as a return of her "equity contribution" because it was not otherwise paying anything for the returned units.

Upon learning of Ms. Wade's resignation, Mr. Brimen was furious. She was his companies' main conduit to the necessary local stakeholders to build special economic zones in Uganda, Benin, and elsewhere in Africa. Without Ms. Wade, Mr. Brimen and PALLC do not have the connections, social capital, or resources necessary for any special economic zone to move forward anytime soon. In retaliation for her resignation, he sought to punish Ms. Wade, deprive her of a career, and steal her contacts for himself.

To that end, on September 22, 2025, Mr. Brimen convened a special emergency meeting of Prospera Africa's Board of Directors, scheduled precisely to occur when Ms. Wade had told him she would be attending her best friend's funeral—and the board then unilaterally attempted to declare her transfer and resignation "null and void ab initio." *See* **Ex. B** at 8. Ms. Wade requested that the meeting be rescheduled, but Mr. Brimen made clear that he would only do so on the precondition that Ms. Wade agree to (1) withdraw her resignations and notices of termination, and (2) agree to his previously rejected proposals on employment and governance of the Company,

6

which were the intended topics of that meeting. In his email to Ms. Wade, Mr. Brimen told her that her actions were "absurd," part of an "orchestrated scheme to defraud NeWAY," and lacking "sanity," asserting that he was "100% right legally, ethically, and strategically." **Ex. C** at 1–3. He stated, "I REALLY DO WANT THIS TO WORK AND WANT TO PROPOSE WE TRY ONE MORE TIME," but refused to bend on his earlier demands. *Id*. When Mr. Brimen could not get what he wanted, he went on the offensive, accusing Ms. Wade of "attempting to strip Company assets," engaging in "self-dealing and breach of fiduciary duty," and potentially violating criminal law by executing the 2025 Assignment. These statements were included in the signed board minutes, and were later repeated to Ms. Wade's contacts. *See* **Ex. D** at 2.

## PROCEDURAL BACKGROUND

PALLC initiated arbitration proceedings against Ms. Wade with the American Arbitration Association on November 3, 2025. PALLC's sprawling Arbitration Demand included eight counts[3] and sought pecuniary and injunctive relief that would require Ms. Wade to rescind her resignation from PALLC, turn over her life's work, and remain in servitude to PALLC indefinitely under an unenforceable restrictive covenant. The next day, PALLC filed an "Emergency Motion for Interim Measures of Protection" pursuant to AAA R-39 seeking, among other things, an order refraining Ms. Wade from claiming any ownership interest in certain IP assets (the "Motion"). *See* **Ex. E** (Mot.) at 11; *see also* **Appendix 2** (summarizing relief requested by PALLC). Shortly thereafter, PALLC filed two "erratum," in which PALLC fixed errors apparently caused by using generative AI to draft its initial pleadings, including hallucinated case citations and false quotations from the Operating Agreement. *See* **Ex. F** (Nov. 6, 2025 "Errata"); **Ex. G** (Nov. 11, 2025 "Errata"). Shortly thereafter, on November 20, PALLC filed an Amended Demand and Emergency Motion, asserting largely the same claims and seeking the same relief. *See* **Exs. H**, **I**. Ms. Wade filed her

---

[3] (1) Breach of Section 8.5 of the Operating Agreement; (2) Breach of Fiduciary Duty; (3) Breach of "Misc Sections" of the Operating Agreement; (4) Misappropriation of Trade Secrets; (5) Conversion; (6) Tortious Interference with Business Relationships; (7) Declaratory Judgment; and (8) "Specific Performance and Injunctive Relief." *See* **Ex. K** (Arb. Demand).

7

answering statement to the previous version of the Demand the same day, along with counterclaims. *See* **Ex. J**.

On November 18, 2025, Retired Justice James R. Zazzali was appointed as the R-39 Arbitrator for purposes of adjudicating PALLC's Emergency Motion (the "R-39 Arbitrator"). **Ex. L**. That same day, Ms. Wade submitted a letter to the R-39 Arbitrator, requesting that he consider whether the Motion could be adjudicated as a matter of law while reserving the right to offer her own evidence, should the R-39 Arbitrator deem it necessary to do so:

> Your Honor should therefore deny the motion with prejudice without requiring Ms. Wade to submit a complete substantive response and adduce her own evidence. Ms. Wade vehemently denies the allegations against her and must be given a fair opportunity to respond. Therefore, in the event that the Tribunal determines that the Motion must be fully considered on factual grounds, Ms. Wade respectfully requests a reasonable amount of time to gather evidence in response and submit it for consideration prior to any restraint being granted.

**Ex. M** at  2. The R-39 Arbitrator held a R-39 Preliminary Hearing the morning of Friday, November 21, 2025. **Ex. N**. During that hearing, the R-39 Arbitrator invited the Parties to submit additional papers that day; Ms. Wade filed a submission requesting bifurcation of a decision on the Motion, whereby the legal issues would be addressed first, and if necessary, Ms. Wade would be given time to provide a substantive factual response to the Motion. *See* **Ex. O** at 1, 3–5.

On December 8, 2025, the R-39 Arbitrator issued a "Decision and Order on Claimant's Emergency Motion for Interim Measures of Protection" (the "Order"). *See* **Ex. B**. In the Order, the R-39 Arbitrator denied all seven of PALLC's requests for relief as written, but entered a modified version of one of its requests:

> Pending a final hearing and award in this matter, Respondent, Magatte Wade, be and hereby is ordered to refrain from claiming any ownership interest in, or exercising any ownership rights over, the intangible property described in the IP Assignment included in Exhibit A to the Operating Agreement (including the "Cheetah Cities" brand and associated goodwill as applied to charter cities or special economic zones) and shall not hold herself out as the owner of such IP. None of the foregoing shall be deemed a limitation on Wade's ability to compete or engage in other professional activities or to continue any personal or professional relationships that she had before becoming a member of

> PALLC, so long as she does not make use of the foregoing intangible property. Nothing herein should be construed to in any way limit or abrogate Wade's contractual, common law, or statutory obligations relating to PALLC's confidential information or trade secrets.

**Ex. P** at 1.[4] Additionally, in the Order, the R-39 Arbitrator made a number of preliminary findings, including that:

- Ms. Wade resigned from—and thus was no longer a member, director, or officer of—PALLC on September 10, 2025 (**Ex. B**. at 11–12);

- Ms. Wade was not prohibited from resigning from PALLC under Wyoming law (*Id.* at 11–12);

- Ms. Wade's distribution of a quarterly newsletter to PALLC investors after her resignation was not improper (*Id.* at 15–16);

- Ms. Wade is permitted to communicate with PALLC investors and business partners regarding the fact that she is no longer affiliated with PALLC (*Id.* at 16–17);

- PALLC's purported "trade secrets"—such as "the legislative progress on the Ugandan draft special economic zone legislation" and "the location and status of the acquisition of Elephant Island"—are not PALLC's trade secret or confidential information (*Id.* at 17);

- PALLC cannot enjoin a "prospective libel" by Ms. Wade, nor can it prevent Ms. Wade from filing a lawsuit against it (*Id.* at 18–19);

- There is no evidence that Ms. Wade has engaged in any discovery misconduct, nor is there any evidence that she has not participated in the arbitration proceeding in good faith (*Id.* at 19–20).

Of course, all of these findings are subject to adjudication in the arbitration itself, which has yet to commence in full, as indicated by the R-39 Arbitrator in his Order. *See id.* at 3, note 1 (noting limited factual record considered in deciding the Order), at 21 (noting that the Order is made "[p]ending a final hearing and award in this matter").

Following the issuance of the Order, on December 31, AAA issued a letter notifying the Parties that "the office of the R-39 Arbitrator is functus officio," noting that "no further jurisdiction or authority" would be retained by the R-39 Arbitrator. **Ex. Q** at 1. AAA went on to state that the

---

[4] On December 29, the R-39 Arbitrator submitted a slightly revised version of his Order that clarified the scope of the injunction; the revised language is used here.

Parties would now "proceed with administration of the case in chief" and, in a separate correspondence, began the process of scheduling an administrative conference in which the process of appointing a merits arbitrator would be commenced. *Id.*; **Ex. R** at 1–2. In connection with scheduling that administrative conference, PALLC submitted a letter indicating that it "intends to file a motion for partial summary judgment on the self-dealing and breach of fiduciary duty claims underpinning the preliminary junction [sic] at the earliest opportunity." **Ex. S** at 1. PALLC also filed yet another Amended Demand—completely re-writing its Demand—the same day. *See* **Ex. T**.[5]

On January 12. 2026, PALLC filed this action, seeking to confirm the Order entered by the R-39 Arbitrator. *See* ECF No. 1 (the "Petition"). PALLC's Petition seeks to set in stone several of the preliminary factual findings and the resultant interim legal conclusions set forth in the Order for the express purpose of establishing "preclusive effect" in the underlying arbitration. *Id.* at 12–13; *see also* ECF No. 1-3 (Proposed Order) at ¶ 3. Notably, nowhere in its Petition does PALLC contend that Ms. Wade has violated the Order; likewise, PALLC's recently filed R-39 motion does not contain any allegations that Ms. Wade violated the Order. *See* **Ex. U**.

### ARGUMENT

When parties elect to hash out their differences in arbitration, the FAA provides for the enforcement of the resulting final award by federal courts. Conceptually, this makes sense: because the parties contractually agreed to resolution by an arbitrator, the loser is not permitted to re-litigate an unfavorable arbitration outcome in court. By the same logic and in line with the requirements of the FAA, a federal court cannot transform a preliminary, non-final order into a judicial decree. With its Petition, PALLC asks this Court to do exactly that.

**I.    There is no federal subject-matter jurisdiction over non-final arbitration awards.**

Subject-matter jurisdiction is the statutorily-conferred power of the court to hear a class of

---

[5] As of this filing, a merits arbitrator has not been appointed in the underlying arbitration. Discovery has not commenced, and there is no hearing date set.

cases. *Al Raha Grp. for Tech. Servs. v. PKL Servs., Inc.*, No. 1:18-cv-04194-AT, 2019 WL 4267765, at \*2 (N.D. Ga. Sept. 6, 2019). Federal courts have limited subject-matter jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). To trigger federal subject-matter jurisdiction under the Federal Arbitration Act, an arbitration award must be "final" and "not interlocutory." *El Mundo Broad. Corp. v. United Steelworkers of Am., AFL-CIO CLC*, 116 F.3d 7, 9 (1st Cir. 1997). "The prerequisite of finality promotes the role of arbitration as an expeditious alternative to traditional litigation." *Hart Surgical, Inc. v. Ultracision, Inc.*, 244 F.3d 231, 233 (1st Cir. 2001); *see also Michaels v. Mariforum Shipping, S.A.*, 624 F.2d 411, 414 (2d Cir. 1980) ("[A] district court should not hold itself open as an appellate tribunal during an ongoing arbitration proceeding, since applications for interlocutory relief result only in a waste of time, the interruption of the arbitration proceeding, and ... delaying tactics in a proceeding that is supposed to produce a speedy decision.") (quotations and citation omitted). Federal courts do not have subject-matter jurisdiction over interim, or non-final, awards. *See Al Raha Grp.*, 2019 WL 4267765, at \*2–3; *Schatt v. Aventura Limousine & Transp. Serv., Inc.*, 603 F. App'x 881, 887 (11th Cir. 2015).

In this context, finality turns on "[w]hether the award indicates that it is final and whether the arbitrator intended the award to be final." *Int'l Union, UnitedAuto., Aerospace & Agric. Implement Workers of Am., AFL-CIO v. Trane U.S. Inc.*, 970 F.3d 956, 959 (8th Cir. 2020) (citation omitted). "An arbitrator's ruling is not final if there is a substantive task left for the arbitrator to perform." *Orion Pictures Corp. v. Writers Guild of Am., W., Inc.*, 946 F.2d 722, 725 (9th Cir. 1991). Moreover, a "final" arbitration award is one intended by the arbitrator to be his complete determination of every issue submitted to him. *Anderson v. Norfolk and Western Ry. Co.,* 773 F.2d 880, 883 (7th Cir. 1985).

## II.     The R-39 Order is not final.

Here, the Court need not look far to determine that the R-39 Order is not final. First, the language of the R-39 Order demonstrates that the R-39 Arbitrator did not intend for the order to be considered final. Second, the preliminary nature of the R-39 Order demonstrates its lack of

11

finality. Third, the arbitration rules that apply to the R-39 Order conclusively establish that the R-39 Order is subject to modification and thus cannot be deemed final. The cases cited by PALLC in its Petition only highlight that confirmation of the R-39 Order is improper.

> **A.    The language of the R-39 Order shows that the emergency arbitrator did not intend it to be final.**

The language used in the R-39 Order provides clear evidence that the R-39 Arbitrator did not intend it to be final. First, the R-39 Order is not styled as an "award," let alone a "final award." Rather, the R-39 Order bears the title "Arbitrator's Decision and Order on Claimant's Emergency Motion for Interim Measures of Protection." *See* **Ex. B** at 1. Nowhere in the R-39 Order does the Emergency Arbitrator describe the Order as an "award."

Second, the R-39 Arbitrator *explicitly* limited the scope of the Order, making clear that it is expressly interim and subject to a full adjudication on the merits. He did so by prefacing his sole order with the language "***pending a final hearing and award in this matter***." *Id*. at 21. This limitation is perfectly reasonable, given the early stage of the arbitration proceedings and the limited evidence upon which the R-39 Order was decided. To confirm the R-39 Order now would essentially eliminate the parties' ability to litigate an entire claim in arbitration.

Last, the R-39 Arbitrator directly addressed the issue of finality in the Order:

> For clarity, the facts described in this Decision and Order are based on the factual record supplied to the Emergency Arbitrator by the Parties. ***No discovery has been conducted***, and Respondent, to avoid litigation expenses, unilaterally and voluntarily demurred from submitting a "full factual response" to Claimant's application.[6] As a result, the factual record on which this decision is made is limited. ***No factual findings contained herein should be considered final***.

*Id*. at 3, note 1 (emphases added). This language confirms that the R-39 Order should not be "considered final" because it is based on a factual record that has not been developed.

---

[6] Ms. Wade respectfully disagrees with the R-39's Arbitrator's characterization of her actions with respect to briefing the issues giving rise to the R-39 Order. *See infra* p. 13.

**B.      The preliminary nature of the R-39 Order weighs against a finding of finality.**

The procedural posture of the R-39 Order also indicates that it is not a final award. The R-39 Motion was filed the day after PALLC initiated the arbitration proceedings, and no merits arbitrator has been appointed. The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Given this limited purpose, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. *Id.* A party thus is not required to prove his case in full at the preliminary injunction stage, and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits. *Id.* For the same reason, the conclusions laid out in the R-39 Order should not be set in stone.

In the Petition, PALLC repeatedly states that the R-39 Order was "actually litigated" and that the Parties have "an opportunity for presentation of evidence." *See* Pet. at 13, 15. That is not accurate. Ms. Wade repeatedly informed the R-39 Arbitrator that she could offer evidence in support of her opposition to the Motion, but that she would need additional time to gather and present it. *See* **Ex. N** at 1–2, **Ex. P** at 1. Ultimately, the R-39 Arbitrator decided the Motion without giving Ms. Wade the opportunity to offer her own evidence—evidence that will ultimately be the subject of discovery in the underlying arbitration. *See* **Ex. B** at 3, note 1. Ms. Wade expects that once discovery is completed, the evidence available to the merits arbitrator will make clear that there is no basis for any injunction, preliminary or permanent, against her.

**C.      The AAA Rules establish that the R-39 Order is not final.**

Throughout the Petition, PALLC repeatedly cites AAA R-39(f) in support of its argument that the R-39 Order cannot be modified, making it final for purposes of confirmation. *See* Pet. at 8, 12, 13. However, the full text of R-39(f) cuts directly against PALLC's position:

> Any application to modify an interim award of emergency relief must be based on changed circumstances and may be made to the emergency arbitrator *until the non-emergency ("merits") arbitrator is appointed*; *thereafter such a request shall be addressed to the merits arbitrator*. The emergency arbitrator shall have no further power to act after the merits arbitrator is appointed unless the emergency arbitrator is named as the merits arbitrator or as a member of the panel.

AAA R-39(f) (emphasis added). While the emergency arbitrator's authority ended after issuing the Order, R-39(f) makes clear that interim measures may be revisited by the merits arbitrator once appointed.

Likewise, PALLC misapplies the concept of *functus officio*. It refers to the R-39 Award as having "unmodifiable *functus officio* status." *See* Pet. at 11, note 2. But, as set forth above, *functus officio* applies **only** to the emergency arbitrator's *jurisdiction*, not to the full merits arbitration or merits arbitrator's authority to revisit interim measures as the matter progresses. The intent of the R-39 Order was not to fully adjudicate one of PALLC's claims before the appointment of a merits arbitrator or any discovery. It was to maintain the status quo while the merits arbitration proceeds. To confirm the R-39 Order at this stage of the case is inconsistent with both aims.[7]

**D.     The cases cited by PALLC support dismissal of the Petition.**

PALLC cites five cases for the proposition that interim awards are sufficiently final to be confirmed by this Court. While those cases do find that the awards were final, they are distinguishable from the facts of this case and support the opposite outcome.

---

[7] Moreover, the Fifth Circuit has recognized that there are well-established exceptions to the *functus officio* doctrine, including one that allows an arbitrator to decide issues that have been submitted but not completed adjudicated by an earlier award. *See Brown v. Witco Corp.*, 340 F.3d 209, 219 (5th Cir. 2003). The revisiting of a preliminary injunction order issued without full adjudication and opportunity to present evidence falls squarely within that exception. *See Teamsters Loc. 312 v. Matlack, Inc.*, 916 F. Supp. 482, 486 (E.D. Pa. 1996) (citing exception to *functus officio* doctrine in decision refusing to enforce arbitrator's substantive ruling because only one party had the opportunity to present its case).

In each of the cases cited by PALLC, the arbitral tribunal held a merits hearing, and in most, the parties were given the opportunity to present evidence. *See, e.g.*, *Vital Pharms. v. PepsiCo, Inc.*, 528 F. Supp. 3d 1304, 1306 (S.D. Fla. 2020) (noting that the "Emergency Arbitrator held a hearing on the merits of Pepsi's application"); *Pac. Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019, 1023 (9th Cir. 1991) (temporary order granted after a series of hearings and a review of evidence); *Yasuda Fire & Marine Ins. Co. of Eur., Ltd v. Cont'l Cas. Co.*, 37 F.3d 345, 352 (7th Cir. 1994) (holding that interim award was final because the parties had "opportunity to present their evidence and arguments to the arbitration panel at the preliminary hearing").

For example, in *Island Creek Coal Sales Co. v. City of Gainesville, Florida.*, 729 F.2d 1046 (6th Cir. 1984), the interim award was granted after a full evidentiary hearing was conducted before a three-person arbitration panel. While the parties awaited the arbitrators' decision, Gainesville announced it was terminating its contract with Island Creek, and Island Creek submitted a written request to the arbitrators to compel Gainesville to preserve the status quo until the arbitrators could reach a decision. *Id.* at 1048. In contrast, Ms. Wade was not given a full merits hearing and was not afforded the opportunity to present evidence.

By way of further example, in *Sperry International Trade, Inc. v. Government of Israel*, 689 F.2d 301, 303 n.2 (2d Cir. 1982), an award for injunctive relief was granted after a hearing, and "considering… the large number of documents submitted (directly or, during the month prior to the hearing, […] in favor of and in opposition to such injunctive and other relief."). Again, Ms. Wade was not afforded the opportunity to submit documents or evidence in support of her opposition to PALLC's demand for injunctive relief, nor was there an evidentiary hearing.

This Court should look to and follow cases that are more analogous to the facts at hand.

15

For example, in *Al Raha Group for Technical Services v. PKL Services, Inc.*, the court declined to exercise its jurisdiction and confirm an arbitral award because it was not final. 2019 WL 4267765, at *1. In assessing whether the award was final, the court noted that the interim award was granted only "to pause the crumbling relationship between the parties until such time as the full arbitration tribunal could be convened." *Id*. at *3. The court also acknowledged that the award itself was an "interim placeholder that did not purport to resolve finally any of the issues submitted to arbitration." *Id*. Here, where the arbitration is also set to move forward with a full adjudication of the merits of PALLC's claims, the Order is nothing more than a temporary placeholder—and even acknowledges as much.

*Schatt v. Aventura Limousine & Transportation Service, Inc.*, 603 F. App'x 881 (11th Cir. 2015) provides further support that the Order here is not final. In *Schatt*, the court found that the award was not final because it was clear from the award "that the arbitrator's work was not complete." *Id*. at 887. The order noted that a separate hearing would be necessary because a number of outstanding issues remained. *Id*. The court stated that the arbitration was still ongoing and that the cases cited by the district court to support the finding that the award was final were inapposite because in those cases, the claims and defenses of both parties had been adjudicated, and the only outstanding issue was attorney's fees. *Id*. at 887–88. Here, where a merits arbitrator has yet to be appointed, and multiple claims (and counterclaims) still need to be resolved (as stated explicitly in the Order), PALLC cannot dispute that the parties' claims and defenses have not been resolved and the arbitration remains ongoing.

### III.    PALLC's demand that the Court bestow the R-39 Order with "preclusive effect" undercuts the goals of the FAA.

With its Petition, PALLC seeks to treat the R-39 Order as a trial court judgment—indeed, by requesting this Court to confirm the Order, PALLC essentially seeks to convert the Order into

a final judgment. But even final arbitration awards are not wholly analogous to trial court judgments. "[A] judgment upon a confirmed arbitration award is qualitatively different from a judgment in a court proceeding, even though the judgment is recognized under the FAA for enforcement purposes." *Guerra v. L&F Distributors, LLC*, 521 S.W.3d 878, 887 (Tex. Ct. App. 2017), quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1133–34 (9th Cir. 2000). A judgment rendered on a decision of a court or jury at the conclusion of a judicial proceeding confirms the merits. *Id.* at 1133. However, the FAA requires the trial court to enter judgment upon a confirmed arbitration award, without reviewing either the merits of the award or the legal basis upon which it was reached. *Id.* Essentially, then, the court confirms the resulting order, not the legal basis underlying the order.

PALLC does not disguise the purpose of its Petition. It is not seeking confirmation of the R-39 Order for purposes of enforcing it—if that was the case, PALLC would have alleged that Ms. Wade has in fact violated the R-39 Order. Rather, PALLC explicitly seeks to extract narrow statements from the Order and convert them into immutable facts such that Ms. Wade is prevented from ever presenting any evidence or argument on those issues in the underlying arbitration. *See* ECF No. 1 at 12–13. This would undercut the fundamental purpose of the FAA—that is, to allow contracting parties to adjudicate disputes in arbitration without judicial intervention and to conserve the time and resources of both the courts and the parties. *See Michaels*, 624 F.2d at 414–15 (judicial review of arbitrator's interim, non-filing ruling is inconsistent with the aims of the FAA); *Berkowitz v. Republic of Costa Rica*, 288 F. Supp. 3d 166, 174 (D.D.C. 2018), ("[T]he Arbitration Act contemplates that courts should not interfere with arbitrations by making interlocutory rulings.") (quotation omitted); *Blue Cross Blue Shield of Mass., Inc. v. BCS Ins. Co.*, 671 F.3d 635, 638 (7th Cir. 2011) ("[J]udges must not intervene in pending arbitration to direct arbitrators to resolve an issue one way rather than another.").

## CONCLUSION

For the foregoing reasons, Ms. Wade respectfully requests that the Court dismiss PALLC's Petition to confirm the December 8, 2025 Arbitration Order (ECF No. 1) with prejudice.

Dated: January 23, 2026                    Respectfully Submitted,

                                           By: /s/ *Katherine P. Chiarello*
                                           Katherine P. Chiarello
                                           Texas State Bar No. 24006994
                                           **BOTKIN CHIARELLO CALAF PLLC**
                                           1209 Nueces Street
                                           Austin, Texas 78701
                                           T: (512) 615-2341
                                           F: (737) 289-4695

                                           Kate Watson Moss (pro hac vice forthcoming)
                                           Olivia E. Sullivan (pro hac vice forthcoming)
                                           **BENESCH, FRIEDLANDER,**
                                           **COPLAN & ARONOFF LLP**
                                           71 South Wacker Drive, Suite 1600
                                           Chicago, Illinois 60606
                                           Telephone:  (312) 212-4949
                                           Facsimile: (312) 767-9192
                                           KWatsonMoss@beneschlaw.com

                                           Rena Andoh (pro hac vice forthcoming)
                                           **BENESCH, FRIEDLANDER,**
                                           **COPLAN & ARONOFF LLP**
                                           1155 Avenue of the Americas
                                           26th Floor
                                           New York, New York 10036
                                           Telephone: (646) 777-0043
                                           Facsimile: (646) 755-3397
                                           RAndoh@beneschlaw.com

                                           *Attorneys for Defendant, Magatte Wade*

## CERTIFICATE OF SERVICE

I certify that on this 23rd day of January 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record who have appeared in this case.

                                           /s/ *Katherine P. Chiarello*
                                           Katherine P. Chiarello

18